Charles A. Loreto, J.
This condemnation proceeding has been initiated by petition and order of this court vesting title in petitioner Port Authority Trans-Hudson Corporation (path), a wholly owned subsidiary of the Port of New York Authority (Port Authority).
The 53 damage parcels are located in the States of New York and New Jersey. They include the interstate rapid transit electric railway owned by Hudson Rapid Tubes Corporation (hrt), which operates between terminals at 33rd Street and Cortlandt Street in Manhattan and terminals in Hoboken and Jersey City, New Jersey, with through service to Newark, and the land with two 22-story office buildings at 30 and 50 Church Street, Manhattan, owned by Hudson and Manhattan Corporation (h&m).
Damage Parcels 1 through 4 are respectively the land with two 22-story office buildings and annexes and the two interconnecting bridges located at 30 and 50 Church Street. Damage Parcels 5 through 53 consist of all the properties in both States owned and used by the claimants for railroad purposes prior to condemnation. Leaseholds, fixtures, easements and other rights, claims and charges also are involved.
The proceeding was instituted pursuant to statutes enacted by the Legislatures of New York (L. 1962, ch. 209) and New Jersey (L. 1962, ch. 8), which granted jurisdiction over it to the Supreme Court of the State of New York, New York County, and provide that the property in each State shall be valued in accordance with the laws of that State.
On September 1, 1962, title to these properties vested in the petitioner pursuant to court order. The trial, involving their valuation, has required the presentation of extensive testimony and much documentary evidence over the course of many months.
Prior to the title vesting date both the railroad system and the buildings 30 Church Street and 50 Church Street were owned and operated under the name of Hudson & Manhattan Railroad Company. Because it had been operating at a loss over a number of years and was unable to meet the interest due on the funded debt, an involuntary petition under chapter 10 of the Bankruptcy Law (U. S. Code, tit. 11, ch. 10) was filed by three of its bondholders on December 14, 1954. The Dis *488 trict Court appointed Herman T. Stichman trustee for the debtor, authorizing him to carry on its business.
On December 31, 1961, the reorganization was terminated under a plan whereby h&m has continued its corporate existence under the new name. It continues to own and operate the realty — as of January 1,1962, the property at 30 and 50 Church Street. Its subsidiary, Hudson Rapid Tubes Corporation -(hrt) took over the ownership and operation of the railroad.
Therefore, necessarily treated as separate legal units and considered as separate economic units, proof on valuation was received at the trial separately for properties of the railway and the property of the realty corporations. However, this condemnation proceeding is and remains one and insofar as the evidence is interrelated, it will be so considered in the over-all analysis of the proceeding.
THE PROPERTY AT 30 AND 50 CHURCH STREET
This realty will be considered first. On behalf of petitioners two realty appraisal experts testified, S. Edwin Kazdin and William Morris. And as such, on behalf of claimants, Paul T. O’Keefe and William MacRossie, testified. All of them presented adequate qualifications and declared their familiarity with the subject buildings and downtown New York real estate. The appraisals of Kazdin and Morris have but minimal differences. And the appraisals of O’Keefe and MacRossie also do not substantially differ.
At the outset, it will be desirable and helpful to take a look at how the experts, generally arrived at their valuation figures. Since MacRossie’s appraisal does not significantly differ from O’Keefe’s, nor Morris’ from Kazdin’s, it will be sufficient for illustration and further analysis to focus upon the appraisals of O’Keefe and Kazdin, who incidentally were more deeply examined during the trial.
Conceptus of O’Keefe’s (Claimants’) Appraisal.
O’Keefe appraises this property at $23,000,000. (It might be well to note here that MacRossie’s valuation is $23,500,000.) O’Keefe’s valuation is predicated upon a rehabilitation of the buildings, which in his opinion would be “ consistent with the highest and best use of the property.” He believes that its maximum income potential could be realized only with complete rehabilitation of a character similar to the treatment of the Federal Government rented space. To an estimated cost of $6,500,000 for completing the rehabilitation program, he adds $3,000,000 for estimated loss of rent during three years that it would take to do the work.
*489 In his appraisal, he uses an applied rent for office space on whole floor basis of $4,879,000, takes the actual rent for the stores and miscellaneous of $247,928.99, and a slightly higher rent than the actual for the railway terminal to be based on the anticipated real estate tax, to wit, $217,000 — giving a total rental of $5,705,428.99.
In arriving at these rentals, O’Keefe uses a 5% vacancy rate for office space and the same rate for stores.
From the gross income, he deducts: (1) operating expenses of $1,718,000 having considered actual operating charges and estimates by engineers in his firm; (2) $285,271 for vacancies and bad debts, and $855,000 estimated real estate taxes on a projected assessment of $19,000,000.
This would leave a net income of $2,847,158, which he capitalizes at 8%%, arriving at a figure of $32,500,000. From this figure, he deducts the $6,500,000 to be spent for rehabilitation and $3,000,000 for loss of income during rehabilitation, resulting in a value of $23,000,000 for the properties.
He arrives at a land valuation of $8,600,000, using an over-all per-square-foot rate of $100. Of the net income, he states $516,000 is attributable to the land, capitalized at 6%, and that the balance of the income, to wit, $2,300,000, can be attributed to the buildings.
Considerations which in his opinion favor complete rehabilitation are both external and internal. External proof of success in such modernization he finds in a large number of downtown office buildings. Internal evidence of its desirability and practicality, he finds in the expenditure by the trustee in the years between 1957 and 1962 of more than $6,000,000 in the modernization of the buildings. In his opinion, an investor would incur a greater risk in undertaking partial rehabilitation rather than complete rehabilitation because if he did only the former, the difficulties encountered by the trustee with partial modernization would be continued. Also, he believes that the 37 % vacancy of the buildings is a plus and very favorable factor for carrying out his program.
Conceptus of Kazdin’s (path) Appraisal.
Kazdin’s first appraisal gives a valuation of $13,200,000 for the property and his supplemental appraisal, $14,500,000. (It may be well here to note Morris ’ first appraisal is $12,540,000 and his supplemental, $13,795,000.) The latter is premised upon the assumption of the operation of the railroad. Both Kazdin’s and Morris ’ appraisals are based on partial rehabilitation of the buildings, i.e., of the public corridors and only vacant office space.
*490 Kazdin contemplates an expenditure of $2,750,000 for such rehabilitation. In his opinion, it would not be good judgment for a prospective buyer to contemplate spending $6,500,000 except on negotiated leases.
He arrives at total rentals of $4,008,000, using actual rentals for the stores and office space and an assigned rental for the vacant office space to be rehabilitated.
He uses $1,884,000 as potential operating costs after renovations and rehabilitation with 90% occupancy of office space and 95% occupancy of stores. He justifies his figure for operating costs, having considered the buildings’ actual operating costs and his firm’s experience. He uses $644,000 for real estate taxes, using assessed valuation of 1962-1963 of $15,111,000, These two expense items add up to $2,528,000, which deducted from estimated total effective income of $4,008,000, leave $1,148,000 as estimated net income.
Using a 9% capitalization rate to the net income figure, he gets a valuation of $16,444,000 (rounded) for the property. From this figure, he deducts a total of $3,300,000, which he divides into $2,750,000 for rehabilitation and $515,000 for losses to reflect the development of the tenancies to 90% occupancy by the third and final year of modernization. This leaves a figure of $13,114,00, which Kazdin rounded out to $13,200,000 as his valuation for land and buildings.
In arriving at land value, he uses the unit lot approach and arrives at a land value of $3,963,000 for 30 Church Street and $2,055,000 for 50 Church Street, or a total of $6,018,000. Therefore, the net applicable to buildings would be $7,200,000.
Kazdin’s appraisal with railroad operating gives a value of $14,520,000 for the property. It differs from the first appraisal in three respects: (1) the income is increased by $133,000; (2) the operating expenses are increased by $54,000; and (3) the deduction for rehabilitation and adjustments for time and tenant development is $500,000 less.

The Continuance of the Railroad should be Considered a Factor in the Valuation of the Buildings.

Since path has submitted two appraisals by each of its experts, it becomes necessary at the very start to determine which of them should be considered. The principal appraisals of Morris and Kazdin assume the h&m would cease operating. Shortly before the commencement of trial they prepared “ supplemental ” appraisals of the properties with the railroad in operation. The latter are substantially higher than the former.
Claimants’ appraisals are premised upon the continued operation of the railroad.
*491 Inquiry was made as to why path’s witnesses prepared their first appraisals with that assumption. The court need not speculate as to how or why it came about. For the court concludes at the threshold of this proceeding that the only premise for its consideration and determination of just compensation of the land and buildings requires the reflection of the continuance of the railway and its presence in the subsurface of the property.
The belief, if seriously entertained by anyone, that the railroad would be abandoned and dismantled upon condemnation, defies stark necessity and clear reality. There were legislative findings that passenger transportation is “vital and essential to the economic well-being of the northern New Jersey-New York Metropolitan Area ” and that rail services “ are and will remain of extreme importance to such transportation”. The evidence reveals the heavy reliance by New Jersey commuters on the Hudson Tubes to get to Lower Manhattan business district. For instance, of its 31,560,058 paying passengers in 1961, 95% of them were interstate. Also the charts submitted show for its average weekday passenger volume in 1961, 40% of the total used it during the peak morning hours. There is no doubt that the vehicular facilities, bridges and tunnels, would be insufficient and incapable of handling, especially during the work-a-day week, the trans-Hudson passenger traffic. The following chart illustrates for all the trans-Hudson transportation the relative decrease in auto passenger use during peak hours and the corresponding increase in the use of mass transportation facilities:
TRANS-HUDSON TRANSPORTATION: PASSENGERS BY MODE OP TRANSPORTATION
(1961 — the last full year before condemnation)

Eastbound

Annual Two-Way Peak-Hour

Hudson Tubes........................... 30,162,000 (10%) 22,234 (24%)
Pennsylvania RR........................ 13,677,000 ( 5%) 5,430 ( 6%)
Ferries (CNJ and EL).................... 10,264,000 ( 4%) 11,373 (12%)
Lincoln Tunnel buses..................... 65,742,000 (23%) 29,922 (32%)
Holland Tunnel buses.................... 2,237,000 ( 1%) 870 (1 %)
George Washington Bridge buses........... 17,016,000 ( 6%) 7,957 ( 9%)
Automobiles............................. 146,633,000 (51%) 14,574 (16%)
Total............................... 285,731,000 (100%) 92,360 (100%)
The above chart shows also that Hudson Tubes carries during peak hours one fourth of all trans-Hudson riders. The inevitable increase in population in northern New Jersey and available *492 employment opportunities in lower Manhattan for New Jersey residents will undoubtedly put the Hudson Tubes to continued use and probably to greater use, especially with some modernization of the railway, particularly as a journey to work facility.
The court finds that the Hudson Tubes is a vital, essential and indispensable trans-Hudson commuter railway facility. This fact has been declared by every responsible public official of both States who has had an interest in the subject of interurban commuter traffic. No one ever uttered an intimation that the Public Service Commission would suffer it to cease operating because of its financial difficulties. It has been in operation for half a century and was in operation on condemnation date, operating satisfactorily in safe and sound condition at speed and spacing between trains equal to the performance of New York City subways.
Although its operations had not for a number of years been financially profitable, it continued to render essential service. It was not defunct. In the court’s opinion, neither the affected public nor the responsible authorities would permit it to cease operating. The notion of its abandonment, surrender of its Hudson Terminal and junking of all its facilities, including the four tunnels under the Hudson Eiver, in view of all the facts, approaches an impermissible dream. For the cost of replacing them, up-to-date and fully modernized, then perhaps not giving greater service, would be the overpowering deterrent to a realization of such a prospect.
Therefore, the only appraisals, in all fairness, the court should consider, are those premised upon a continuance of the railroad’s operation.

Rehabilitation of the Buildings would be Feasible, Practical and Warranted.

path’s attorneys contend that claimants havé “ spun a web of tenuous assumptions tied to 1 hypothetical buildings ’ which have no evidentiary support ”. Also they urge that claimants’ valuation is predicated on projected rehabilitation of the buildings, a “ theoretical ” undertaking, such as they say has been rejected in condemnation cases by the courts. Among other decisions they cite Levin v. State of New York (13 N Y 2d 87) and United States v. 25.406 Acres of Land (172 F. 2d 990). Those decisions are distinguishable. The Levin case rejected capitalization of income from nonexistent structures on unimproved land, and United States v. 25.406 Acres of Land also is a case where “ The property owners have sought to recover a *493 valuation based on the capitalization of income of nonexistent apartments ” (p. 995; italics supplied).
Here, we deal with existing buildings — buildings for which the trustee in recent years expended over $6,000,000 to rehabilitate— a rehabilitation undertaken in large areas of the buildings during the reorganization, which was then considered and determined to be necessary. At that time, O’Keefe expressed approval of the limited rehabilitation undertaken by the trustee. He believes his opinion was then right although he thinks the decision and approval for rehabilitation did not go far enough. It was ineffectual, in his opinion, to give the buildings the surge for increased tenancy that they would have gained, had the trustee been empowered to undertake complete rehabilitation.
It is sheer nonsense to speak of a rehabilitation proposal for 30 and 50 Church Street as “ hypothetical ” or “ new ” buildings, or to label them, as such, either because another $6,000,000 is proposed by claimants’ experts for their further and complete rehabilitation or another $2,800,000 as projected by path’s experts for their further and partial rehabilitation.
What is here involved is a question of fact. That is whether feasibility and practicality permit the consideration of only partial additional rehabilitation or of more complete rehabilitation. Therefore, the question of further rehabilitation is one of the degree to which it probably and prudently would be undertaken.
Partial Rehabilitation would be Feasible, Practical and Prudent.
The conception of the necessity, practicality and desirability to rehabilitate these buildings is not one of recent origin with the claimants as suggested by path’s attorneys. It is something envisioned as necessary even at the beginning of the reorganization. For the trustee stated in his final report that the buildings had a reasonably profitable operation in 1954 but that they were threatened with disaster unless rehabilitated and modernized to compete with new buildings.
Moreover, Kazdin, path’s expert, not only approved part rehabilitation, but in addition favored additional rehabilitation. In his appraisal report, under a “ Program of Rehabilitation ” Kazdin states: “ The program of rehabilitation undertaken by the ownership was essential in order to stop the vacating of tenants, make the buildings competitive in the rental market and attract new tenancies. In my judgment, this program should be completed in order to increase the income and protect the value of the property. The vacant areas should be rehabilitated or renovated in varying degrees, giving consideration to the eco *494 nomic feasibility for doing such work. This would require consideration of the location of the vacant space and the potential rentals that might be obtained. I inspected the areas that had been renovated and rented and reviewed the cost of the work that was done. In estimating the cost of necessary rehabilitation, I considered the record of expenditures in the property itself and made comparisons with the modernization that was done in other buildings, In my opinion, a minimum expenditure of $2,750,000 is required in order to complete this work.”
path’s attorneys in their trial reply brief declare: “ At most, the space which had deteriorated through vacancy could, in its highest and best use, be restored to tenantability and an estimate of rental potential based thereupon be made. This was the undeniable thesis of petitioner’s witnesses Morris and Kazdin and the only sound basis for estimating value in the premises.”
All the experts would seek the highest and best use for the property. The fundamental difference in their appraisals and valuations is that petitioners would predicate their appraisals on rehabilitation of vacant office space only and claimants would include also occupied office space still unrehabilitated.
Kazdin testified that “ the highest value is developed by bringing the property into a competitive condition with investment of substantial funds for the rehabilitation and modernization ”, This the trustee had attempted in incurring an expenditure of more than $6,000,000 for improvements, including new elevators, new electrical risers, provision for central air conditioning in 30 Church Street and rehabilitation of approximately 395,000 square feet of office space.
O’Keefe, while agreeing with Kazdin in this observation, and commending the trustee for his efforts in modernizing as far as he did, believes the problem of bringing the buildings into full competitive position required complete rehabilitation of the properties.
The court finds that what was already actually done in these buildings reflects inherent proof of the practicality and reality of their extensive rehabilitation.[1] This conclusion is buttressed by external proof, which is found in the fact that 66 older office buildings in lower Manhattan with a total of 16,000,000 square feet of office space have been given the “ new building ” treatment. A strikingly similar building where this was successfully done is that at 17 Battery Place, designed by the same architect *495 and constructed about the same time as 30 and 50 Church Street buildings.
The citation of and quotation from Salzberg v. State of New York (24 A D 2d 664, 665 [3d Dept., 1965]) to the effect: “ the theory of potential use (for which, in truth, the property was physically inadequate and incapable) was supported by no evidence of any substance and rested solely on conjecture ” is inapplicable to the facts found here. This is not a situation as is claimed of hypothetical buildings with projected renovations “ so conjectural and speculative as to be worthy of no weight whatever ”. Clearly, in the court’s view, a proposal of rehabilitation at least to the extent proffered by path’s experts would be feasible, practical and prudent to undertake. The question as to whether the program should include the occupied nonrehabilitated office space may well be deferred for later consideration.

Valuation to be Based upon Capitalisation of Income.

When title was taken in condemnation, the two office buildings and their annexes, Damage Parcels 1 through 4, were income-producing. The submitted appraisals of both parties are not in disagreement about the principle of law to be applied. Valuation of such property should be based upon the capitalization of income. This is the applicable law.
The basic question presented and the one as to which there is wide disagreement is what net income figure is to be used for capitalization.
There is presented by the opposing appraisals a multitude of questions of fact to resolve. The more significant ones arise because the experts of the parties premise their conclusions principally on differences in their projections of anticipated rentals, vacancy percentages and estimated operating costs. Of course, variances in any or all of these ingredients of the appraisals lead to wide differences in their final estimated figures. These items will be examined separately and thoroughly.

The Actual Bents do not Represent Fair Rents on September 1, 1962.

path’s experts testified that income actually received on vesting date should be the criterion with some modest augment for limited prospective modernization, whereas claimants’ experts testified that actual income must be viewed as low and abnormal because of historical and extraneous factors and that the court should consider the reasonably anticipated income which would result from prudent investment in complete modernization.
*496 Kazdin reports ‘[1] Eliminating the government space, the average rental for the space rented in the buildings is $4.02 a sq. ft.”; further, “ The rental value of the vacant space was estimated on the assumption that the space would be renovated and improved in order to meet competition and attract tenants.”
He estimated normal occupancy for this building would mean 90% of the total area which could be reached within a period of three years, and he assigns an average rent of $4.07 per square foot for 30 Church and $4.09 per square foot for 50 Church for all space rehabilitated and not rehabilitated.
In his original report — excluding the railroad, estimating alternate uses and income for the concourse, track level and basement areas occupied by it, Kazdin ascribes a total rental value of $225,000 for that space. In his supplemental report, he ascribes $395,000 for it. With this income difference of $170,000, his valuation of the property with its income capitalized at 9%, then is increased by $1,300,000 over his appraisal which excluded railroad operation and therefore this valuation is given at $14,500,000. Morris’ supplemental appraisal is likewise increased by almost the same amount, to wit, $1,255,000.
Morris ascribes a potential rent for office space to 30 Church of $2,171,500 and its annex, $196,750 and to 50 Church, $1,391,800 and its annex, $32,500 — for a total of $3,792,550.
For basement, mezzanine and stores, he computes $632,700 rent. With this added, the total rent he would give to Damage Parcels 1, 2, 3 and 4 is $4,425,000. Although in his appraisal report he does not spell out how he arrived at these figures, in his testimony at the trial, he stated he used actual rent paid for all occupied space whether rehabilitated or not rehabilitated and for vacant space to be modernized he assigned a rent of $3.50 to $4.25, depending on the type of space and location.
Morris believes that the actual rents represent fair rents and that the Government lease made early in 1962 represents the highest rent obtainable for the space under normal market conditions.
These views were opposed by claimants ’ experts and ardently assailed by their counsel. They illustrated discrepancies in Morris’ purported meticulous assignment of rent, which did not bear favorable scrutiny. For instance, for 30 Church — sixth floor, he assigned $4.19, and for its seventh floor, $4.54. When asked to explain the reason for the difference, he failed in the court’s opinion to show that the absence of air conditioning could be the proper basis of distinction. Too, in some instances, it was demonstrated that the rent he'assigned to space with his *497 purported treatment was less than the actual rent paid for comparable space.
Kazdin used the actual rent paid for all occupied space which he considered fair, notwithstanding a large number of tenancies were statutory or of short-lease duration. And he did not believe the bankruptcy of the building had any adverse effect on normal leasing negotiations, nor did he attribute any significance to the threat of condemnation. These views Morris, too, entertained. Claimants, to the contrary, attribute vacancies and poor, abnormally low rents to these conditions.
For vacant space to be rehabilitated as he proposed, Kazdin assigned rental considering floor, size and exposure and used an average of $4.09 for 50 Church and $4.07 for 30 Church on an as-divided basis, attaining for this space a rent of $1,444,059. The average rent was $4.14 per square foot actually paid as he testified for all space occupied in both buildings, which includes rehabilitated space and approximately 175,000 square feet which had no rehabilitation and some additional space (72,000 square feet) which merely had been “ refurbished ” and not air-conditioned. As this includes an electricity service charge of 32 cents for the Government space only, the average over-all rent therefor was $4.08 per square foot.
On behalf of claimants, William Capen of Brown, Wheelock, Harris & Yought expressed the opinion that rehabilitated office space in 30 and 50 Church Street would command a rent of $4.50 to $5 per square foot on a whole floor basis without electricity. With electricity, in his opinion, it would be 25 cents higher.
And William Steeknicky, an officer of 17 Battery Place (admitting that Federal space at 30 and 50 Church is better in some respects), testified that, rehabilitated with 97%% occupancy, the average rental in his building is $4.50 per square foot and all rehabilitated usable space for the entire building is $4.50 per square foot.
Before condemnation date and as of January 1, 1962, these buildings became free of prior handicaps and restrictions. The actual rents that had been in effect up to that time should not be equated with fair rents. Even the Federal occupied space represents a bargain to the Government — short-term leases and low rent and in a way, a “ God-send ” because of the special circumstances. The court believes the rents were depressed and abnormal, the result of transitory events — bankruptcy of the owner, rumors and threat of condemnation — factors definitely militating against obtaining better rentals. Under those circumstances, the buildings were not in a competitive condition *498 and position to bargain for and to secure fair open-market rentals.
Once freed of those shackling conditions, they were capable of entering the rental market on competitive terms. It may be said that then their future prospects became brighter. And then there could be no reason to deny the buildings’ increased rentals which could be derived from improvements that a prospective purchaser could feasibly and prudently make.
Therefore, the court finds that actual rents obtained prior to January 1, 1962 do not represent fair rentals and are not proper to use for this valuation. Its findings of fair rent to be used for this valuation are given in the final analysis under “ Court’s Findings ” for the realty.

Consideration of the Projected Vacancy Rate.

Petitioner’s attorneys describe the vacant office space as greatly deteriorated and “ slum-like ” — the buildings “ second class ”. The only relevant purpose the court can divine for this description is that of implying the requirement of an enormous amount of money in order to achieve an improvement such as envisioned by claimants’ experts. The condition of those areas has been described by 0 ’Keefe as poor. The court having viewed the buildings, finds the vacant office areas generally poor and bad where ripped apart and the occupied unrehabilitated offices merely antiquated in that they lack modern or up-to-date improvements. A multitude of photographs were offered by petitioner tending to portray wretched conditions in such areas. However, the court is satisfied that as a whole they represent distortions and exaggerations, especially of the factual condition of light.
In any event, the fact is that for their appraisals the experts on both sides contemplated a renovation of all the vacant spaces, including corridors — the claimants’ experts going farther in that they would additionally renovate the occupied unrehabilitated office areas.
Kazdin testified ‘ ‘ given time and money the buildings would achieve normal occupancy ”. He would advise a purchaser to spend $2,750,000 for their rehabilitation. He testified, “ They had not had, in my view, an occupancy which was normal when measured by ownership who invest money and want to protect their investments.” Entertaining the same view, O’Keefe expressed the opinion such ownership wisely would carry the improvements throughout the buildings.
*499 Such rehabilitation would completely take care of all such negative conditions. Therefore, the question as to how bad conditions of all those areas were on September 1, 1962 is covered by the appraisal experts and may well be left there.
The parties are in agreement in ascribing a 5% vacancy for the store space and all space other than office. However, as to office space, path’s experts apply a 10% vacancy rate; whereas, claimants apply a 5% rate and both attempt to sustain their conclusion by referring to surveys and statistics, as well as their own experience and judgment.
Kazdin chooses the 10% vacancy prospect, believing 30 and 50 Church are in the City Hall business district for which such a vacancy rate is shown and also because between 1957 and 1962 of all the new competitive office buildings erected in Manhattan, 35% of them with 11,000,000 square feet of space are in the downtown area and three or four of them are near these buildings. Too, he points to 250 Broadway completed in 1962, with rentals averaging $4.75 per square foot, which, one year later had a vacancy of 20%.
An interesting fact to be noted in regard to the projection of path’s experts of 90% occupancy and retaining the tenants in occupancy (with the total occupancy of 63% as of September 1, 1962) is that of the vacant space to be rehabilitated then only 65% need be rented to reach the over-all 90% occupancy anticipated by these witnesses.
O’Keefe expressed the opinion that 30 and 50 Church are adjacent to the financial and insurance district, that they are not in the City Hall office and loft district, which in 1957 showed a 3.3% vacancy, and in 1962 a 12.5% vacancy for office space. He would allow a 5% vacancy rate for the office space because the buildings would be made competitive with new buildings and enjoy a normal market for its modernized space. He points to their exceptional location and the fact that even during the bankruptcy period from 1954 to 1957, their office vacancy was but 4%; and that it was because of the bankruptcy when leases then began to expire that tenants moved out to 100 Church Street (completed in 1958) and to other new buildings. Then it became, he says, virtually impossible to rent space even though brokers did whatever was possible to canvas prospects, because elevator modernization proposed several years earlier, was not started until 1961. Further, he testified during the progress of this work, the mess created and the great inconveniences to tenants and guests caused added deterrents to renting. Moreover, it was too late because condemnation had been rumored *500 and soon became official. The court believes these causes created the vacancies and prevented normal renting of office space in these buildings.
Too, claimants call attention to the Whitehall Building to the south at 17 Battery Place and the Woolworth Building to the north, both modernized in recent years, enjoying 95%. William Zucker, vice-president of the Downtown Business Association, William Durstein of William White & Company, and Arthur Sweeney, III, assistant vice-president of Braislin, Porter and Wheelock, Inc., gave such testimony. One William Steltnicky, executive vice-president of the Whitehall Building at 17 Battery Place, the building remarkably similar to 30 and 50 Church, described its rehabilitation and its occupancy as of January, 1965, to be 97%%.
The witness John Capen, a real estate broker and first vice-president of Brown, Wheelock, Harris & Yought, which has specialized in downtown leasing during the past 40 years, also testified as to occupancy rate of rehabilitated buildings. He named several old buildings of the same vintage as 30 and 50 Church — 25 Broad Street, 17 Battery Place, 11 Broadway, 15 Broadway, 26 Broadway (in the shipping district); 1 Broadway, 120 Broadway (in the financial district); and the Woolworth Building, 233 Broadway (in the City Hall district); all of which underwent a pattern of rehabilitation, as here proposed, with new elevators, air conditioning (package or complete), acoustical ceilings, recessed fluorescent lighting, modernization of corridors, floor covering and Venetian blinds. He testified that these buildings in the past five years maintained an occupancy rate of 90 to 95% and higher.
The layout of these buildings, both 22 stories high, with wings and no .setbacks as required under zoning regulations for new structures, affords large open areas with unusual fenestration for large space users which, together with the fact that they border the financial and insurance districts and have the benefit of mass transportation not equalled in any buildings in downtown Manhattan, admits the finding of a higher percent office space prospective rental in those than found in the loft and City Hall districts. Of course, when modernized.
Even in 1957 O’Keefe entertained a view about the buildings not unlike his present one, for he then testified in the reorganization proceeding: “ I think the buildings have certain remarkably fine features. In other words, the buildings are in good structural condition. The defects in the buildings are mechanical. The floor layout is excellent. With modernization, you, *501 for future tenants, give them space that would be more attractive than the space to be found in the new building ”.[2]
Considering all relevant factors, the court does not believe a vacancy rate of 10% would be justified after modernization; nor would one of 5%. It is of the opinion that upon modernization, the buildings more likely would not suffer a vacancy percentage in excess of 8%.

Consideration of Projected Operating Expenses.

In view of the differences and contrasts as to all other items by the parties, it would have been too much to have expected anything but substantial disparities in their estimates of operating expenses. On behalf of claimants, O’Keefe and MacRossie give respectively as their estimates $1,718,000 and $1,615,450, for their estimates of projected operating expenses, both assuming 95% occupancy. In their first appraisals for path, Kazdin and Morris give respectively as their estimates $1,884,000 and $2,000,000, assuming 90% occupancy, and in their supplemental appraisals with the same occupancy, they give as their estimates of operating expenses respectively $1,938,000 and $2,060,500. The increase of $54,000 and $60,000 over their prior estimates were not detailed nor explained.
In 1961, the actual operating expenses were just short of $1,400,000 with 67% occupancy.
In its Appendix C set forth on page A-5 of its main trial brief, path does not tabulate its experts’ estimated expenses side by side with those of the opposing experts. It might have been helpful to the court. Even if they were similarly broken down and set side by side, the task of determining which more likely is accurate, would still remain difficult. However, exaggerations and duplications become evident on close scrutiny, and as a result, it becomes possible to determine which presentation is closer to the acceptable.
In the same Appendix path lists what it would want treated as “ 1961 actual” (at 50.6% occupancy) operating expenses, from which it deduces the cost to be $3.10 per square foot of occupied space. This is not helpful. Rather it is misleading and not accurate. For, although the occupancy rate was 50.6% *502 on November 20, 1961, it was greater during the early months of 1961, and as high as 76.1% on February 20, 1961, thereby showing 231,425 more square feet of occupancy than on November 20. This demonstrates that the actual per-square-foot operating cost was much lower than that path would lead the court to believe.
An example of duplication is found in general building repairs. Kazdin and Morris respectively assign for this item $145,000 and $115,000, whereas O’Keefe’s estimate is $90,000 and MacRossie’s $100,000. The buildings’ actual average for it over the preceding five years was $81,275. Kazdin admitted that his figure included some masons and carpenters, who came under his building payroll column. If their wages were withdrawn from general building repairs, then Kazdin’s estimate would be about the same as O ’Keefe’s for this item.
Not overlooking the figures given by the other appraisers, the court will examine (for comparative purposes) the figures of O’Keefe and Kazdin (those of Kazdin in his original appraisal, the only place where they are detailed). Taking first what is by far the largest combined item, payroll and cleaning, for this we find O’Keefe assigns $795,000 and Kazdin $910,000. Morris’ is even higher at $990,000. O’Keefe’s estimate for electricity is $350,000 and Kazdin’s $375,000. For repairs and maintenance, however, O’Keefe’s figure ($90,000) is lower than Kazdin’s ($110,000) by $20,000. For painting and decorating, the difference is slight — O’Keefe gives $70,000 and Kazdin $75,000. But for tenant changes there is a substantial difference. O’Keefe assigns $60,000 and Kazdin $100,000.
These are the more significant categories showing the variances, which result in making Kazdin’s total estimate for operating expenses higher than O’Keefe’s by $166,000 or $210,000 if the higher figure in his nonitemized supplemental appraisal is used.
Morris’ estimate of operating expenses is exaggerated. He has no breakdown for his payroll figure. For painting and decorating and for altering tenants ’ premises, he gives an estimate of $295,000. This in contrast to Kazdin’s of $175,000; and O’Keefe’s $130,000 — divided, $70,000 for painting and decorating, and $60,000 for altering tenants’ premises. The actual and historical charges for these combined items from 1957-1961 was $77,000 annually. Morris’ estimate clearly exceeds the actual expenditure by more than $200,000. How he attempts to account for it, is remarkable and unacceptable. Although great expenditures already had been made for modernization and over $1,000,000 in fhe government space alone, *503 Morris’ figure includes estimates for tenant changes, which would involve a ripping out and replacing some of that modernization, such as, hung ceilings, fluorescent lighting and partitioning. He testified “ You have to destroy practically everything and the cost actually becomes greater than if the installation were not in ’ ’. This is a viewpoint the court cannot share.
Not all the operating expenses increase proportionately to occupancy increase. For example, elevator maintenance and general building repairs would rise somewhat but not in proportion to occupancy increase, when the latter does not become overly large and might be in the range of 20 to 25%. Cleaning and electricity would definitely increase substantially with occupancy, although not necessarily proportionately.
The court has considered the fact that claimants’ appraisers’ testimony regarding operating expenses was supported by the engineers in their offices who are the specialists in the field. path’s appraisers, concededly not qualified as experts in the area of operating expenses, stated they relied on information obtained from men in their offices who were not produced to testify and supplement their testimony.
After painstaking and thorough consideration of the evidence pertaining to projected operating expenses, the court will accept for its use in seeking to attain a fair valuation the higher of claimants’ estimates and apply it to the occupancy per cent it is of the opinion is more probable and would be fair. This is the sum of $1,718,000, to which will be added $75,000 as reserve for contingencies already mentioned.

Allocation of Value to the Land.

As the land and buildings at 30 and 50 Church Street are one, in that they constitute a single economic unit, they should be valued as such. And since the property is income-producing, valuation is to be based on a calculation of return on investment. An allocation of value separately for the land serves as a check on the over-all valuation.
path’s witnesses used the “unit lot” approach and claimants’ witnesses the square-foot method in calculating value for the land. Although the former may appear to be more meticulous and exact, in that it purports to estimate value of individual unit lots of 25 by 100 feet, determining their number, adding percentage increments for corners and plottage, it is not a realistic approach for this particular land valuation.
The land area with which we are concerned of more than 86,000 square feet embraces most of two large city blocks in the lower Manhattan business district. This is patently not *504 comparable to a lot 25 by 100 feet, containing 2,500 square feet. No one has pointed to any land area of any substantial size, certainly not of the same size, in that location suitable and available for office building. To assemble- such a plot would require the extraordinary feat of procuring by purchase 34 contiguous unit lots or an unspecified number of larger contiguous units in a comparable location. The court believes the scarcity of available land in the downtown district would make the assembling of such a plot not only difficult but virtually impossible.[3]
Another important factor distinguishing the land here from the usual plot of land is the fact that there is a railroad terminal under its surface, producing an income of approximately $755,000 yearly — truly something of a rarity. This is an important factor justifying an increment in the over-all valuation of the land.
These distinctive features make this land particularly unsuitable for the “ unit lot ” valuation approach.
Nor does the court find the sales submitted by path’s experts, Morris and Kazdin, comparable. The deed transfer of 30 and 50 Church Street to h&m on consummation of the reorganization was not a sale in the ordinary course of business. Moreover, no purchase price was paid. Sales 4 through 11 and 13 through 15 listed by path involve properties less than 1/10 the size of 30 Church and much less than the combined plottage of 30 and 50 Church. There is no close resemblance in size. Sale 12 located on West Street is under the West Side elevated structure. It clearly is not located in the .same or adjoining street or within the same business center.
“When property, on the same or an adjoining street, is described as bearing a close resemblance, or nearly corresponding, to the one in question as to improvements, size, location, general adaptability, and within the same business center, it may be said to be similarly situated” (Penn. Co. for Insurances on Lives, etc. v. Philadelphia, 268 Pa. 559, 563-564; also 1 Orgel, Valuation under Eminent Domain, §§ 136-138). By these tests, none of the listed sales relied upon by path are particularly significant as similarly situated and comparable.
And sale 3 of the land on which the building at 100 Church Street was built, which Kazdin admitted was less valuable than *505 30 and 50 Church, having been made in June, 1958, more than four years before the condemnation date, was- not clearly made “ within a reasonable time of the vesting of title ” in this proceeding (L. 1947, oh. 819, § 1, subd. [1], par. 1). Although somewhat comparable, it is not the same size nor as favorably located and too it lacks the in-built transit facilities and special subsurface income of 30 and 50 Church.
Reference is made to a valuation of $5,200,000 for this land by O’Keefe in a 1957 report. This he explained to have been too low, that land values in the next five years increased approximately 25%, and he further justifies his present appraisal because of the scarcity of plottage, making it almost impossible to duplicate a plot this size for office building.
Moreover, claimants’ experts, O’Keefe and MacRossie, declared that as a practical matter land is never bought and sold on a unit lot-value basis. Therefore, considering its size, location, transit facilities, street frontages and unique railroad terminal site, they adopted an over-all per-square-foot value of $100, giving it a total land valuation of $8,650,000. The court finds and assigns an over-all square-foot value of $85 to the land.

Observations About Other Items.

(a) The lack of probative value in the book entries of the parties.
The book entry figures of the parties are of no evidentiary help, path points to the book entry in the final account of the trustee stating $10,800,000 for buildings and $2,290,107 for land. Claimants point to three journal entries of the corporation of January, 1962, showing $5,300,000 for land, $11,787,154 for buildings and $3,668,507 for construction. Also claimants point to a report to stockholders in 1962 stating the balance sheet for their books shows $5,200,000 for land and $15,484,000 for buildings.
The court is unable to ascribe to these book entries any probative force in its determination of just compensation. They are completely unsubstantiated by any proof as to the method and means whereby the figures were obtained. It is not helpful in this proceeding to assert that at one time or another, the trustee or the claimants made such entries in their books of lower or higher figures as the property’s worth.
(b) path’s claim that large expenditures for work additional to that found in its appraisals should be considered.
path called four of its employees to give testimony of what they would consider to be additional and necessary work for the buildings — for instance, fire towers $701,500; removal of orna *506 mental masonry $206,100; new roofing $191,000; steam cleaning $168,000; masonry painting $84,500; window caulking $17,100 and Venetian blinds $30,200 — totalling $1,400,200. In addition, they testified to additional elevators, freight and passenger $770,000 and additional electrical equipment $184,000. The grand total of all these items as given by these witnesses is $2,355,100.
There are several objections to the acceptability and validity of this proof. First, path’s appraisers, Kazdin and Morris, having carefully examined the buildings, never mentioned as necessary or included any of these items in arriving at their valuation. For example, in their appraisals they assumed 90% occupancy, and nowhere mentioned the need for additional elevators or additional electrical equipment. Another large item mentioned by these witnesses — fire towers — has never been found or reported by the Building Department of the city to be necessary, nor has it been included in the appraisals of path’s experts. These items do not merit consideration in this proceeding. Regarding the item pertaining to ornamental masonry, path’s witness chiseled away the cornice to expose a piece of corroded metal. Upon that finding, it concluded that all the stone ornamental coping should be removed. Perhaps it should.
To the extent it becomes necessary with the passing of time to repair or replace any exterior defect or to make interior repairs, these can be met, as O’Keefe testified, out of an ample reserve or contingency fund set aside for such needs. The court is led to believe that these additional building costs, which the court believes to be largely exaggerated, were presented by path’s witnesses not qualified as experts of construction costs, in a final effort to negate practically all value for the buildings. If the court applied value for the land and the figure advanced for these costs were deducted from Morris’ or Kazdin’s total valuation, their net value for the buildings would be absurdly low.
This testimony will be given the probative value it deserves in estimating a reserve or contingency fund in determining fair valuation in this proceeding, and for this purpose the court adds, to the operating expenses it approves, the additional sum of $75,000.
(c) Startling facts about path’s valuations.
Morris’ building value (for both buildings) is $7,055,000. This is without having made any deduction for vacancy losses during his proposed rehabilitation. Even without such a warranted allowance, this ascribed value is but $900,000 more than the total *507 amount spent by the trustee for rehabilitation during the six years preceding condemnation. And before the trustee spent $6,100,000 for the improvement of the buildings they were assessed at $8,550,000 (years 1957-1959).
These observations serve as a check, broadly showing that Morris’ valuation cannot be accepted as accurate and fair. Kazdin’s building valuation is not much better.
path’s witnesses Morris and Kazdin, respectively, give as fair total valuation for land and buildings at 30 and 50 Church Street $12,540,000 and $13,200,000, in their original appraisals, and figures in their supplemental appraisals of $13,795,000 and $14,500,000 respectively, which are below the assessed valuation of $15,100,000 placed on the land and buildings for each of the three years preceding condemnation. Claimants point out that downward variations from assessed valuations are contrary to actualities, especially as to sales of office buildings in Manhattan. They demonstrate that 41 commercial office buildings were sold in Manhattan during 1962 for an aggregate sales price of $69,314,950, when they had a total assessed valuation of $45,153,000. These figures illustrate that the aggregate sales price represents 153.5% of the assessed valuation of those buildings, whereas Morris’ and Kazdin’s appraisal valuations represent but 83% and 87% of the assessed valuation. If what is found to be the usual and normal ratio between assessed valuation and current open-market sales of similar buildings is used as a check in valuation, it would confirm the belief that path’s witnesses are far from the mark in what they ascribe as fair valuation for just compensation to these properties.

Motions to Strike Testimony.

Decision was reserved on several motions made by path’s attorneys to strike certain testimony.
(1) Objection to Spaet’s report on the ground that it relates to an “ improvement ” within the meaning of subdivision (m) of section 1 of chapter 819 of the Laws of 1947 as to which 30 days’ notice prior to trial need be, but was not given. As the court reads and understands the word “improvement” to be used in the statute, it relates to and means anything in the nature of a structure built on previously vacant land. The relevant portion of the act reads: “ no map or plan of proposed streets, drains or Sewers for the subdivision and improvement of any property * * * nor any oral or written estimate of the cost of making such excavation or filling or piling or of constructing any such other proposed structure or improvement * * * shall be received in evidence ”,
*508 The word “ structure ” in the quoted portion of the act, preceding the words “ or improvement ”, tends to define the word “ improvement ” to mean something similar. To hold that it embraces a rehabilitation of an existing structure would be a strained and unwarranted extension of the legislative meaning of the word.
(2) path’s motion to strike O’Keefe’s testimony as to operating expenses because it was shown that he relied on the analysis of Mr. Beeman. Edward Guilford, Chief Engineer of Charles F. Noyes Company, responsible for all engineering in buildings managed by his firm, and who shares responsibility with O’Keefe in estimating such costs, and William Dinerstein, of the operating department of Wm. A. White & Sons, who had examined the buildings, were produced and testified as to reasonableness of the projected expenses under assumed conditions. Therefore, the court 'believes the objection goes to the weight of the testimony rather than to the admissibility.
(3) path’s attorneys also moved to strike Steknicky’s testimony on the ground that it contravenes subdivision (1) of section 1 of chapter 819 of the Laws of 1947, which refers to “ rent reserved or other terms in any lease ”, He was not asked any question as to any lease terms or rent reserved as to which prior notice is required. He testified to the average rent on whole-floor basis paid at 17 Battery Place after rehabilitation. This information might be comparable to similar general information acquired by a real estate expert who would use it in expressing an opinion. The court does not believe it contravened the statute because prior notice had not been given.
Accordingly, these motions to strike, on which decision was reserved, are denied.

The Problem of Vacating Tenants in Occupancy for the Proposed Total Rehabilitation.

In addition to arguments already covered, path contends that complete rehabilitation as contemplated by claimants is unrealistic and speculative (1) because of the improbability or impossibility of clearing occupied unrehabilitated space to carry on the work; and (2) because it would not be realistic or feasible to undertake it without tenant commitments and foreknowledge of what they would want.
path’s attorneys emphasize the fact there would be 260 tenants with space on different floors, as to whom it is no answer to say their removal would be a matter of negotiation.
Undoubtedly, it might prove to be a difficult undertaking, if not formidable, but not necessarily insoluble or impossible. *509 0 ’Keefe would provide a substantial sum of money to be used in the negotiations. He points out that this type of obstacle has been confronted before in similar undertakings and overcome. He testified that one would proceed with the general contracting like air conditioning and for subdivision of the actual space and partitioning and would wait for the tenants. He expressed the opinion that for the small tenants it would be a matter of trading, dealing and negotiation. Of the 260 existing tenancies, 68 were statutory or month to month, 10 would expire in 1962, 65 in 1963, 44 in 1964, and 56 in 1965. Only 17 would remain beyond the three years allowed for rehabilitation. Of these 11 occupied space partially rehabilitated, and the remaining six occupied but 6,200 square feet, less than 1% of the total office space of both buildings. To expedite their removal, O’Keefe would lay aside the sum of $600,000. Specially preparing space for a tenant, O’Keefe states, would be at an added cost to the prospective tenant.
path’s appraisers would not advise complete rehabilitation under one program. Beyond the vacant space rehabilitation, they would propose that negotiations with prospective tenants be first had. Such was the manner in which the work proceeded for the Whitehall Building at 17 Battery Place. This undoubtedly is the more cautious approach, and the one the court accepts.
The court believes that in view of the nature and extent of O’Keefe’s professional involvement in lower Manhattan real estate, his close, personal and intimate knowledge of nearly all the large buildings in the area and his vast experience in connection with transactions relating to sale and tenancy of those buildings, he is exceptionally equipped to express a judgment regarding the financing and tenanting a project such as here proposed by him.
But the court is impressed by the aggregate of potentially unfavorable factors to the anticipated net income after rehabilitation as he envisions for these buildings. Principally, they are — the difficulties and expense posed in removing present occupants and delay in accomplishing this so that their space might be renovated in conjunction with other or larger areas; the indefiniteness or uncertainty in obtaining many whole-floor tenants for 10-year leases; and the problem of securing financing above the purchase price for the cost of the renovation.
These pose real drawbacks to the acceptance of the opinion of claimant’s experts as to income potential based on complete rehabilitation. The court believes that these opinions are born of high optimism, presenting the rosiest and most hopeful *510 results. It may be possible and even probable to attain what 0 ’Keefe honestly believes. But the court believes there is more optimism than reasonable probability to assure its fulfillment.

Conclusion (30 and 50 Church Street).

After a careful and thorough consideration of all the evidence, the court finds plausible and acceptable factors in the opposing appraisals, already alluded to and discernible in the analysis set forth below for ready reference and for comparison with the court’s figures and findings, which it is duty bound to state, however, keenly aware that these too are “ speculative ” although “ set down with delusive exactness ” (Louisville v. Cumberland Tel. & Tel. Co., 225 U. S. 430, 436, per Mr. Justice Holmes).
claimant’s appraisal (by o ’keeps)
ESTIMATED INCOME & EXPENSES
Rental Income
Offices No. 30 Church St. (applied rates)....................... $2,947,000.00
Offices No. 50 Church St. (applied rates)....................... 1,932,000.00
(based upon complete rehabilitation of all office space vacant and occupied, not yet rehabilitated)
Stores No. 30 Church St..................................... 231,427.72
Stores No. 50 Church St..................................... 129,862.15
Concourse....................,............................. 188,780.04
Store Rooms............................................... 7,757.00
Union News (Lobbies and Concourse).......‘.................. 31,102.08
Hudson Rapid Tubes (Subsurface Rental applied)............... 217,500.00
Miscellaneous Revenue...................................... 20,000.00
Total $5,705,428.99
gross annual rental:......................... $5,705,429.00
Less: Allowance for Vacancies and Bad Debts — 5% 285,271.00 $5,420,158.00
OPERATING EXPENSES: 1,718,000.00
AVAILABLE BEFORE TAXES:............... $3,702,158.00
Taxes (Assumed Assessment $19,000,000) 855,000.00
NET INCOME IMPUTABLE TO PREMISES: $2,847,158.00
Capitalized at 8M%......................................... $32,500,000.00
deduct: Cost of rehabilitation and loss of income
during rehabilitation................. $3,000,000.00
Rehabilitation COst..................... 6,500,000.00 $9,500,000.00
Appraised Value............ $23,000,000.00
Applied to land at $100 per sq. ft. $8,600,000.00
*511 path’s appeaisal (by kazdin)
ESTIMATED INCOME & EXPENSES
Office Rental Income (Actual)................................ $2,375,908.00
Estimated Rental — Vacancies 353,974 sq. ft................... 1,444,059.00
(Represents:
Applied rent for all vacant office space to be rehabilitated
according to his program.
For 30 Church and annex = 187,179 sq. ft. at 4.07 sq. ft.
For 50 Church and annex = 166,795 sq. ft. at 4.09 sq. ft.
TOTAL OFFICE RENTALS................................ $3,819,967.00
say, $3,820,000.00
less: Reserve for Vacancies & Losses — 10% 382,000.00
EFFECTIVE OFFICE RENTALS.................................. $3,438,000.00
Store Rentals (Est.).......................... $375,000.00
less: Reserve for Vacancies & Losses — 5%.... 19,000.00
EFFECTIVE STORE RENTALS................................... 356,000.00
Other Income
Concourse Stores.......................... $178,000.00
Railroad Facilities......................... 177,000.00
Newstand, Storage, etc...................... 40,000.00
total................................ $395,000.00
less: Reserve for Vacancies & Losses........... 48,000.00
EFFECTIVE OTHER RENTALS 347,000.00
$4,141,000.00
TOTAL ESTIMATED RENTAL INCOME $4,141,000.00
less : Operating Expenses..................... $1,938,000.00
Real Estate Taxes...................... 644,000.00
TOTAL EXPENSES..... 2,582,000.00
TOTAL NET INCOME $1,559,000.00
Capitalized at 9%.... $17,322,000.00
say, $17,300,000.00
deduct: Cost of rehabilitation and adjustments for time and
tenant-devel opment............................... 2,800,000.00
FAIR MARKET VALUE $14,500,000.00
*512 court’s findings
Office Rental Income (Actual)................................... $2,370,000.00
Of Vacant Office Space (to be rehabilitated according to path
[kazdin’s] proposal)
30 Church St.
147,467 sq. ft. at 4.30 = $634,108.00
Annex
39,712 sq. ft. at 4.10 = 162,819.00
$796,927.00
50 Church St.
157,919 sq. ft. at 4.25 = $671,155.00
Annex
8,876 sq. ft. at 4.05 = 35,947.00
$707,102.00
$1,504,029.00
Office Rental — Total........................ $3,880,029.00
less: Contingency Reserve (Vacancies & Losses) — 8% $310,402.00
EFFECTIVE OFFICE RENTALS................... $3,569,627.00
Store Rentals.............. $375,000.00
Less 5% for Vacancies and
Losses................... 18,750.00
EFFECTIVE STORE RENTALS ........... $356,250.00
Other Income:
Concourse............. $178,000.00
Railroad.............. 177,000.00
Newsstand, Storage, etc. 40,000.00
$395,000.00
Less 5% for Vacancies & Losses 19,750.00
EFFECTIVE OTHER RENTALS. $375,250.00
TOTAL OF STORE AND OTHER RENTALS, $731,500.00
TOTAL ESTIMATED RENTAL INCOME............ $4,301,127.00
less: Operating Expenses____ $1,793,000.00
($75,000 in excess of
O’Keefe’s figure)
Real Estate Taxes..... 650,000.00
($15,111,000 —1962-
1963 Valuation)... - $2,443,000.00
$1,858,127.00
Capitalized at 9%........................................ $20,645,000.00
deduct: Costs of rehabilitation and adjustments for time and
tenant-development............................... $2,800,000.00
The court’s finding of fair valuation of land'and buildings
at 30 and 50 Church Street:,....................... $17,845,000.00
*513 THE BAIT,ROAD.

A Profile of the Hudson Tubes.

At the time of condemnation, the Hudson Tubes Railroad operated over eight and a half miles of double-track main line (all but three fifths of a mile owned by hbt), which is laid, for all but three fifths of a mile, in subaqueous and subterranean tunnels between two terminals in Manhattan — one at 33rd Street and Sixth Avenue and the other directly under the Hudson Terminal buildings (30 and 50 Church Street) — and two terminals in New Jersey — one in Hoboken and the other at Journal Square in Jersey City.
Two of the services had their New York terminus at Hudson Terminal and utilized the railroad’s two single-track tubes extending approximately 6,600 feet under the Hudson River between Hudson Terminal in New York and Exchange Place in Jersey City. One of these downtown services continues from Exchange Place to Journal Square, with an intermediate stop at Grove Street; the other continues to Hoboken, with an intermediate stop at Pavonia Avenue.
The two uptown services, also running to Journal Square and Hoboken, respectively, commence in New York at 33rd Street and Sixth Avenue, and thence extend — with stops at 23rd, 14th, 9th, and Christopher Streets — through the two single-track tunnels to New Jersey.
A fifth service, operated by hrt, runs between Hudson Terminal and Journal Square, and thence over the Pennsylvania Railroad’s tracks to Harrison and Newark, New Jersey.
The tunnels through which the trains operate extend more than 70,000 feet in both New York and New Jersey and under the Hudson River. The tunnels were constructed for the greater part of their length by driving shields under compressed air through the silt, rock and mixed face under the Hudson River and then installing a lining of cast-iron rings bolted in place. The subaqueous tunnel sections are of the single-track design.
In addition to the shield-driven cast-iron line segments, which extend approximately 42,600 feet, there are considerable lengths of single-track and double-track tunnels which were constructed by regular rock tunneling and mining methods. Caissons were sunk from the surface to house the switch enlargements in Hoboken and to permit construction of the tracks leading into and out of Hudson Terminal.
Except for Journal Square, all of the stations on the railroad are integral parts of the tunnel system and were hewn out of the same material.

*514
History of Construction.

The construction of the railroad, originally with the plan for one tunnel and two tracks, was commenced in 1874. In 1879, the plan was changed to provide two separate tunnels, each with two tracks to accommodate single-unit trolley cars between New Jersey and New York. Work not having progressed far out of the Jersey shore, a blow-out occurred in 1880, resulting in the loss of the lives of 20 workmen. A shut-down continued for one year, followed by sporadic work until 1891, when again construction halted, this time because of financial difficulties. Work was resumed in 1902 on the two uptown tunnels, when permission was granted for the construction of two tunnels for the downtown line between Jersey City and Fulton Street in New York City. The connection of all lines was completed in 1909.

A Statement of the Valuation Contentions.

Basically because the railroad has not been operating profitably, and would not in the foreseeable future, path’s experts declared that in their opinion its only value is in liquidation or as “ junk ” and that in this condemnation such value would be approximately $1,000,000. Also they declared that this appraisal is confirmed by their ‘ ‘ securities valuation ’ ’ approach in evaluating the securities of the railroad.
The railroad ownership offered uncontroverted expert evidence showing the reproduction cost of the railroad to exceed $500,000,000, and its original actual cost over half a century ago to have been some $62,000,000. Its attorneys correctly urge that the concept of “ just compensation ” cannot be reduced to a formula and is not the subject of mathematical precision but is the result of “ substantial justice ” struck from “ an equitable balance ”. Agreeing that the deficit operation of the railroad would not in fairness permit an award of reproduction cost, its attorneys also contend that an award of the original cost in fairness and equity would not be compensatory. They tender a suggestion of taking the average of the lowest reproduction estimate less depreciation and the original cost, halving this amount, and thereby fixing $127,400,000 as an award for the railroad to represent a fair result to both condemnor and condemnee.
Both parties are aghast and unbelieving of the other’s contention and proposed valuation. Truly, they not only have struck polar positions but approaches that if analogized to goods and metals are neither fungible nor fusible.
The problems here raised are perplexing; the factual situation is unusual. The task of the court, functioning without a jury, *515 in striving to make a just determination in this proceeding, is indeed far from a light one.
In order to fully appreciate the problems posed, one should first become acquainted with the physical plant of the railroad (the court has made the statutory viewing) and have some knowledge of its origin, history and operation to condemnation date.

The Extent of the Railroad Operations.

The railroad operated on September 1, 1962, as it still does, between two terminals in New Jersey, one in Hoboken and the other at Journal Square, and two terminals in New York, one under the Hudson Terminal Buildings at 30 and 50 Church Street and the other at 33rd Street and Sixth Avenue.
There are 8% miles of double-track main lines (all but 3/5 of a mile in subaqueous and subterranean tunnels). The four tunnels under the Hudson River through which the trains run extend 70,000 feet.
There arc four services operated seven days every week on a 24-hour schedule.
Of two downtown services with terminus at Hudson Terminal, one extends to Exchange Place in Jersey City, with a stop at Grove Street, and continues to Journal Square; the other continues to Hoboken, with a stop at Pavonia Avenue.
The two uptown services from 33rd Street and Sixth Avenue, New York, with stops at 23rd, 14th, 9th and Christopher Streets, run also through two single-track tunnels and extend to Journal Square and Hoboken, respectively.
There is a fifth service, known as “ joint service ”, operating between Hudson Terminal and Journal Square over the Pennsylvania Railroad tracks to Harrison and Newark, hbt received 40% of the fares and bore 40% of the operating expenses of this service, which utilized 50 air-conditioned cars bought four years before condemnation, 20 of them purchased by hbt for $1,637,000.
Electricity for the operation of the entire system, purchased from Consolidated Edison, was converted from AC to DC current for traction power at three of its substations, located at Hudson Terminal, Christopher Street, and Jersey City.
An automatic block signal system, with tripper devices along tracks and at junction points, was being replaced and unified under a control panel at Hudson Terminal. There were repair shops and car yards at Harrison Street in Jersey City and a shop for track and station repairs at Hoboken.
*516 Incidentally there were rights of way, stations, station entrances, ventilation lines held under franchises, easements or licenses.

Additional Historical Operational Facts.

What the actual original cost of the construction of the railroad was, the engineering firm of Ford, Bacon & Davis reconstructed from an exhaustive search for and analysis of original records. They found it to be $62,000,000. However, the corporate capitalization of the railroad considerably exceeded that figure. Its financial structure involved a fixed interest indebtedness of more than $72 million and capital stock with a par value in excess of $45 million.
This inflated capital structure remained as a financial deadweight around the railroad’s neck until its reorganization in 1954, despite the fact that during the intervening years it enjoyed peak passenger traffic. This rose from 52 million in 1912 to 91 million in 1920 and to 113 million in 1927. Through those years, the railroad repurchased some of its refunding bonds in the open market. This practice was resumed between 1934 to 1945, when property amortization funds and discount amortization funds were principally used. In the twenties, it was able to meet the bond interest obligations and pay dividends on its stock.
In the thirties, there was a decline in passenger traffic, which saw a resurgence during the war, reaching the high of 83 million in 1943. Since that date there has been a decline to 41 million in 1952.
Fare increases from 10$ to 15^ for the interstate lines and from &$ to 10^ for the New York intrastate line were granted in 1950. Nonetheless, the railroad was not operating profitably. And unable to avoid a default on its refunding bonds, several bondholders filed a petition for its reorganization in 1954.
As of January 1, 1962, it was freed of the bankruptcy proceeding. The decree of the Federal District Court authorized the severance of the realty from the railroad, as has already been noted in the discussion of the realty phase of this condemnation.
The Hudson Tubes is a Vital, Essential and Indispensable Trans-IIudson Bail Commuter Facility.
Claimants do not foresee any further decline in the Hudson Tubes passenger load; on the contrary, they would expect an improvement.
In 1961, the Hudson Tubes carried 31,500,000 paying passengers, 95% of whom were interstate riders. These riders were *517 divided between downtown and uptown Hudson Tube lines during several years prior to 1962 in the ratio of 3 to 2, with traffic about equal for both lines during peak hours. The Hudson Tubes passengers during peak hours represent 40% of its average week-day volume. It is definitely a commuter line and serves a vital role as a journey-to-work trans-Hudson facility — the Tubes carry approximately one fourth of all trans-Hudson riders during peak hours. (See chart supra.)
path’s witness, Roger Gilman, director of Port Development, attributes the prior decline in passenger traffic to shifting of employment opportunities from Manhattan to New Jersey, five-day work week, the usage of automobiles for pleasure, decline in population in certain parts of northern Jersey served by the Tubes, the development of suburban shopping centers, the usage of bus to travel into and out of Manhattan.
Gilman added — “ Basic, also, to this decline is what has taken place affecting rail transit and commuter rail services in all parts of the region and throughout the United States.”
A survey made by the Harvard Graduate School of Public Administration for the Regional Plan Association indicates that job opportunities in Manhattan will increase while its population will decrease between 1960 and 1985. Claimants call attention to what is known as the “ Aldene Plan ”, a proposal of the Railroad Transportation Division of the New Jersey State Highway Department, for rerouting mainline trains of the Jersey Central over the Lehigh and Pennsylvania Railroad tracks to Newark, path estimated in 1961 that the “ Aldene Plan ” would add 4,800,000 passengers to the joint services.
Also claimants show that whereas Lincoln Tunnel suffers congestion and delays during peak hours, none have been encountered in the Hudson Tubes, and path acknowledges that “ if the Hudson Tubes were to cease operations, trans-Hudson vehicular facilities would be incapable of handling the passenger load ”.
All these facts, in the court’s opinion, tend to the conclusion that the railroad will continue to have at least approximately the same level of passenger traffic as in 1961, with the distinct probability of an increase over the course of years.
On all the evidence, the court finds that the Hudson Tubes is an essential railroad facility in the trans-Hudson transportation ; that passenger transportation is “vital and essential to the preservation of the economic well-being of the northern New Jersey-New York Metropolitan area” and that rail services “ are and will remain of extreme importance to such transportation ”.
*518 What we are concerned with is a railroad that has been serving as an indispensable passenger-transportation link between New Jersey and lower New York for over half a century. The natural and beautiful barrier of the Hudson Eiver, due to the increase in population and the advent of the automobile, has made necessary the supplementary links of two vehicular tunnels and the George Washington Bridge. The Hudson Tubes have safely and continuously been operating since 1910 to condemnation date and since then to the present time.
It is impossible to conceal or escape from the fact that this railroad was taken in condemnation as an operating railroad to be continued, as it has been, by the condemnor for the very same purpose and use in its same integrity and with its same components and facilities.

The Railroad should be Valued as of September 1,1962.

The court’s sole responsibility in this proceeding is to evaluate the railroad as of September 1, 1962. Its prior history provides background of interest since the railroad did not appear as out of a vacuum for the first time on that date. And its travail in reorganization provides the conclusive evidence of its financial woes and inability to operate profitably. But it must be remembered that claimants have made no pretense that it is a money-earning enterprise. Its unprofitability is undisputed.
On that fact alone, path’s experts premise their conclusion that its highest and best value is in liquidation. However, none of them suggested that on September 1, 1962 or thereafter it should be dismantled and discontinued. Nor has any responsible person.
Since there has been frequent reference to the reorganization proceeding and the decision of the Federal courts, it becomes necessary to point out that the Federal court was concerned with something much different than is our concern. Its concern was to determine whether the reorganization plan met the statutory test of being “ fair and equitable ” in the treatment of the competing claims of creditors and stockholder interests (Bankruptcy Act, § 174; U. S. Code, tit. 11, § 574). And valuation there was limited to statutory purpose of determining “ how much the enterprise in all probability can earn ” (Group of Investors v. Milwaukee R. R. Co., 318 U. S. 523, 540 [1943]).“ Valuations for other purposes are not relevant to or helpful in a determination of that issue, except as they may indirectly bear on earning capacity” (Consolidated Rock Co. v. Du Bois, 312 U. S. 510, 526 [1941]).
*519 Therefore, the limited scope of the reorganization proceeding and the nature of the Ford, Bacon & Davis Report of 1960 submitted in that proceeding, to which reference has been made by path’s attorneys in their reply brief, predicated upon a number of speculative factors none of which pertained to the status of the properties on condemnation date, dictated its exclusion in this proceeding.

Consideration of Claimants’ Proof for Valuing the Railroad.

The claimants’ evidence submitted for consideration is that showing original cost, reproduction cost, and cost trended to September 1, 1962 from original cost. This was done through members of the firm of Ford, Bacon & Davis, consultants in management and engineering with much experience in the transit and transportation field.
In order to show that their figures are as accurate as possible, they testified to extraordinary research, studies and work they employed in reaching their conclusions. Briefly, this should be outlined in order that credence may be given to the accuracy of their findings and estimates.
Lionel S. Baldin, a vice-president of that firm, was in charge of special projects, including any large project requiring the estimation of reproduction cost less depreciation and the original cost trended less depreciation. Baldin, on the subject project, was responsible for planning, procedures, staffing the current job, staff conferences, conferences with the hrt personnel and with the attorneys.
The project was in direct charge of Leroy H. Sickle, senior in charge, who followed the work day to day in great detail.
The estimates of reproduction cost were divided into several parts, each in charge of a group senior. The tunnels, subways and stations, underground stations were given to David Baillie; the track and signal system to G-. A. Sargent; the electrical system to E. F. Heath; buildings to R. P. Dee; the rolling stock with some incidental items to J. M. Brown; and a variety of odds and ends such as station appurtenances, turnstiles, shop equipment, and items of that nature, to C. J. Smithson. Land, rights of way and easements were appraised by Paul O’Keefe for those in New York State and by J. Robert Ham for those in New Jersey.
The original cost was analyzed under Sickles’ direction. The trending was done by a consultant, H. H. Howland, under Sickles’ direction. Baillie, an outside consultant, also worked with W. R. Bradley, a division civil engineer, on planning, procedures and assistance for carrying out the work.
*520 The services of one Cornelius Conner were engaged and he assisted Baillie and his staff on the tunnel work. Conner had been employed by one of the predecessor companies of Hudson Rapid Tubes in 1950 until his retirement in 1956.
During the course of the work, the group seniors consulted with each other to follow the progress and to expedite the progress.
Upwards of 30 persons (engineers, accountants, and statistical analysts) from time to time worked on the project.
Up to the time Baldin first appeared and testified in court, 16.000 man-hours were spent on the project — 6,000 on the tunnels, subways and stations; 1,000 on tracks and signal system; 2.000 on the electrical system; 1,000 on buildings; 1,000 on rolling stock and ventilating system, and 500 on miscellaneous chores. The original cost took 3,500 man-hours, and the trending over 500 man-hours.
Because of the size and length of service of the condemned railroad property, the first step they employed was to review available published information as to the methods of construction of the variety of items constituting the property. All available drawings, records and other details were studied and materials taken off the various drawings to develop the qualities, types and kind of material and also the method of construction.
Inspections were made of the various items of the property shown on the drawings; visual information was obtained for use in the reconstruction; visual observations of physical deterioration to determine depreciation percentages and amounts; estimating costs of the various items involved (by obtaining material prices, development of labor requirements — not only in time but in sizing of work gangs); and the restriction of working time and other factors involved. The date certain or target date was September 1, 1962.
With respect to materials, the unit prices were obtained, to which was applied overhead — such as transportation, purchasing, handling and labor. Since a job of this magnitude would require it to be done by contract, there was applied the contractor’s overhead and profit.
The engineering costs for the design of the project were estimated by the group seniors. On top of material and engineering costs, there were applied general overheads, the organization and administration of the project as a whole (with its number of design engineers and contractors), the legal expenditures, taxes and interest during construction.
*521 The total of all of the foregoing was the reproduction cost.
With respect to depreciation, physical deterioration was not only visually observed but also records of usage were analyzed and tests performed to help formulate accurate physical condition of the property. Over and above the physical deterioration, depreciation includes essentially lack of use or utility. If not useful in whole, the item was not included in the reproduction cost estimate; if the item was possessed of only partial use or utility, then the nonuseful portion was excluded from the reproduction cost estimate.
Another element of depreciation is obsolescence — arising mostly from newer, more modern equipment or structures being available, sometimes at lower costs but more often than not at lower operating or labor expense and maintenance expense. Adjustments were made in any item of property which was in part or whole physically deteriorated, nonuseful, or obsolescent.
The result of the foregoing work and research by the firm of Ford, Bacon & Davis, is a presentation of the original cost, reproduction cost, and original cost trended, which in abbreviated statement are as follows:
I
Original cost, less retirements — Total $61,874,440-

Principal Items

Tunnels — subways............................................. $31,999,802
Communication and distribution system........................... 5,110,423
Stations and structures.......................................... 3,828,533
Engineering.................................................... 1,844,465
Rights of way and other land used................................ 1,026,055
Rails.......................................................... 821,037
Signals......................................................... 1,248,214
Passenger cars.................................................. 2,421,336
Interest during construction...................................... • 6,427,931
II
Reproduction costs — total $488,462,158.

Principal Items

Tunnels, subways and stations.................................... $424,803,066
Signal system, track and road bed................................. 8,939,927
Electrical equipment............................................ 3,984,014
Rolling stock, tunnel ventilation and drainage systems............... 6,331,560
III
Original cost, trended to September 1,1962 — S447,559,549.
*522 This is the proof which claimants submitted — not disputed for accuracy, although strongly opposed as to its relevancy— for the court to consider in ascertaining just compensation for the railroad.
A Review and Analysis of the Testimony of path’s Experts Concerning the Railway.
path used three witnesses to express an opinion regarding valuation of the railway. They are — George W. Burpee, a professional consulting engineer who has had 60 years’ connection with the railroad industry, their construction, analysis and valuations; William Wyler, also a professional engineer with a background of railroad valuation; and Robert E. Field, an accountant with experience in the examination and analysis of financial statements of public utilities.
All three predicated their valuations basically upon the fact that the railroad had not been operating profitably for a number of years and could not in the foreseeable future. Burpee and Wyler expressed the opinion that it had only liquidation value on September 1, 1962. They also testified that this opinion was confirmed for them by their securities valuation of the railroad. Field, having as an accountant examined the railroad’s financial structure and earnings, expressed his opinion that it had only salvage value.
Wyler gave his analysis of the market value of the securities of the railroad. He arrived at a net market valuation of $16,997,782. He testified that the securities value approach was used as ‘ ‘ confirming ’ ’ his studies and findings of the company’s earnings during the years 1957 to 1961. His conclusion was “ This railroad, in my opinion, has a maximum value of the amount that could be realized from its liquidation ”. He stated that this is his opinion because the company has no earning power.
Burpee expressed an opinion, based upon his experience and examination of h&m, that its highest and best use was in its liquidation. He qualified this opinion by adding, however, that is not necessarily what should be done with it — that in his opinion it had no commercial value since it was not a moneymaking private enterprise. Also, he added that it £< has utility as an absolutely essential public service ”.
Burpee testified that the last time he had anything to do with the sale of a rapid transit railway was in 1940 with the Manhattan Railway. Also he stated that he does not know when a transfer of ownership of any kind of rail rapid transit in any city in this country last took place. And he admitted that there *523 is no private market for this rapid transit, certainly not in this area.
He gave a schedule of improvements that he would find necessary for different components of the railroad amounting to 30 million dollars and approximately 2 million for immediate application to deferred maintenance.
The proposed expenditures would be 18 million for 64 new cars bought by path in 1964; 3.8 million for silicon rectifiers; 1.9 million for signal system; 4.3 million for rehabilitation of stations, of which 2.7 million would be for the Hudson Terminal Concourse, % of a million for drainage and % million for ventilation.
All of these estimated expenditures were furnished to him by path and he stated he agreed with them.
Notwithstanding these proposed expenditures for rehabilitation of those segments of the system (the tunnels will be discussed separately), Burpee testified that as of September 1, 1962, “ the physical condition of the stations was this: that they were operable and they were reasonably safe ”. The improvements were proposed because the public would expect stations of path as good as its bus stations. Continuing: ‘[1] The track situation was in safe condition. * * [5] The rails were also in satisfactory condition”. Of the 211 black cars, 191 in number were obsolete and ready for retirement; the grey cars, 20 in number, were reasonably new, acquired but four years previously. Of the drainage system, the emergency pumps were not in good condition, although the existing pumps would handle normal seepage; and the ventilation system was wholly inadequate and half of the proposed expenditure would be for “ a bladder ”, a contraption that would be a possibility, of which he does not know its use in any railroad.
“The signal system was in the process of renovation” to silicon rectifiers, which he would install for the rotary converters. He admitted that the Transit System, Long Island Bail Boad, and the New York Central Bailroad, as well as Consolidated Edison Co., still use rotary converters, with programs in some instances to install silicon rectifiers over a number of years.
Burpee found some fault with the tunnels, their size and curves. This condition, he denotes as obsolescence, and to it he ascribes an inability to use the modern cars of 90 feet in length and 10 feet wide.
Notwithstanding the curves of the Hudson Tubes, he admitted that the system permitted the run of 30 trains per hour, the same number that the curves of the hit permitted.
*524 For the tunnels, out of the total 32 million proposed expenditure, he had a deferred maintenance item of $82,000. And of the value of the total railway system, the tunnels, in his opinion, represented more than 50%. However, without the railway he declared the tunnels would have no value.
The conclusion the court deduces from Burpee’s testimony is that the Hudson Tubes, as a railway system, ik essentially a safe one in relatively good condition, operating on schedules comparable to the irt of New York City, but requiring replacement of obsolete cars and repairs and substitutions in different parts or components of the system. Suggested expenditures for face-lifting of stations and improvements in the signal system, by continued substitution of silicon rectifiers for rotary converters and the like, represent programs of improvement that would be spread over a number of years, even if path were to undertake to complete them, and in the court’s opinion Avould add to the value of the railway — an addition to the value, the claimants should not bo aAvardcd and which they do not ask.
The court finds that the railway as a physical plant has been and continues to operate regularly and satisfactorily, although it is susceptible to improvements. Only as such, the court should appraise it in searching for just compensation to the owner — not as a railway operating profitably — for it has not and probably would not, while in private OAvnership, operate profitably.
Virtually conceded is the fact that there exists no market • for such a rail rapid transit commuter railway. This has been declared in the past as a judicial finding. (See Matter of City of New York (Sixth Ave. El. R.R.], 265 App. Div. 200, 207.)
The usual approach of ascertaining commercial value or market value, therefore, is AArholly inappropriate here. Too, no legal authority has been cited or found wherein a ‘ ‘ securities valuation” approach has been considered appropriate for valuation in condemnation of a railway such as this. Nor is the court persuaded to consider the securities valuations submitted by Burpee and Wyler — even though it finds them subject to infirmities in that they are based on a paucity, dearth or absence of market transactions, as “confirmatory”, as they stated, of their primary valuation based on absence of profit. However, these opinions offer the court a view of the railway, as might be said, from different windows and different perspectives, Avhich should be considered in making its final decision.
*525 CONSIDERATION OF APPLICABLE LAW.

The Exceptional Circumstances of This Case do not Permit the Application of any Conventional Legal Formula.

The taking is legal and therefore proper. Having been tested in the courts, it can no longer be questioned. Now the issue is as to the compensation. This must be just and thereby satisfy the Constitution. Both the Constitution of the United States and the Constitutions of the two States wherein the condemned property is located command and guarantee “just compensation ”. That is the only criterion of an award in eminent domain. For clarification and emendations of its application, one must turn to the court decisions. The compensation awarded must be just both to the owner whose property is taken and to the public that must pay (United States v. Commodities Corp., 339 U. S. 121, 123 [1950]).
path having taken the position that the railroad has only liquidation value, its attorneys rely heavily on the statement by Mr. Justice Holmes in Boston Chamber of Commerce v. Boston (217 U. S. 189, 195): “And the question is what has the owner lost, not' what the taker gained” as the inviolate standard of valuation — a statement reiterated in cited decisions, quoting from Spitzer v. Stichman (278 F. 2d 402, 410) as “ The only invariable principle of valuation in condemnation proceedings ”.
But in a situation, as is here found, in which the taker has gained for use what the owner in the same use has lost, the quoted statement of Mr. Justice Holmes, loses the poignancy it otherwise would seem to have. And this is so because the Supreme Court has also held and reiterated that it is proper to consider the use for which the property taken is suitable and that it is desired for the same purpose.
Thus, in Boom Co. v. Patterson (98 U. S. 403, 408 [1878]) the court stated: “ So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future.”
And the Judges of the same court years later in United States v. Chandler-Dunbar Co. (229 U. S. 53, 76-77 [1913]) approvingly referred to the above quotation taken from the *526 Boom case. And in Chandler-Dunbar, with respect to the phase of the case before it, the court stated; “ The exception taken to the inclusion as an element of value of the availability of these parcels of land for lock and canal purpose's must be overruled. That this land had a prospective value for the purpose of constructing a canal and lock parallel with those in use had passed beyond the region of the purely conjectural or speculative. That one or more additional parallel canals and locks would be needed to meet the increasing demands of lake traffic was an immediate probability. This land was the only land available for the purpose. It included all the land between the canals in use and the bank of the river. Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, it is proper to consider the fact that the property is so situated that it will probably be desired and available for such a purpose. [Citations.] ” (Olson v. United States, 292 U. S. 246, 255; see, also, Bonbright, Valuation of Property [1st ed., 1937], pp. 424, 425.)
Something in the nature of an equipoise is struck when the actual use of the owner is the same as that of the taker. This is the factor lacking in the cases cited by path’s attorneys. All distinguishable for this basic reason seem to fall into three categories.
1. Where the function and use of the property as part of the utility expired. Such are Matter of City of New York (Manhattan Ry. Co.) (265 N. Y. 170, 172-173 [1934], affd. sub nom. Roberts v. City of New York, 295 U. S. 264 [1935]) which involved only the disused spur of the Third Avenue elevated structure on 42nd Street; United States v. Toronto Nav. Co. (338 U. S. 396 [1949]) involving a car ferry of Lake Erie Railway which had lain in dock unused for five years before condemnation and Market Street Ry. Co. v. Commission (324 U. S. 548 [1945]) cited by path is a rate-making case, not a condemnation valuation.
2, Cases where value was claimed based on the capacity of the governmental unit to pay. An example is Onondaga County Water Auth. v. New York Water Serv. Corp. (285 App. Div. 655, 666 [4th Dept., 1955]).
3. Cases where the property was taken for a different use — (not the identical use to which it was put while in the hands of the owner). Examples are United States v. Cors (337 U. S. 325, 330-334 [1949]) where a commercial tug boat for which *527 enhanced value was sought because of its adaptability to military uses, evoked the warranted rebuke by Mr. Justice Douglas that that would represent “hold-up” value. The tug vessel was requisitioned during war to be used as a steam-heating plant for heating and pumping fuel oil from oil barges into naval combat vessels. There were four dissents to the decision. For the majority, Mr. Justice Douglas wrote directing a reversal in order to have determined the extent of enhancement in market value due to increase in demand caused by the war. United States v. Chandler-Dunbar Co. (229 U. S. 53, 80 [1913]) which involved a small island with a “ strategic value ” as a necessary part of a comprehensive system of river improvement. Moreover, there was a market value for the island, as the court stated: “ That the property may have to the public a greater value than its fair market value affords no just criterion for estimating what the owner should receive ” (p. 80); United States v. Boston, Cape Cod & N. Y. Canal Co. (271 F. 877, 893 [C. A. 1st, 1921]) a shipping canal for which greater value was claimed because of its “ special and peculiar utility * * * to the government as a taker for purposes of national defense ” and Spitzer v. Stichman (supra, cited and quoted from by path for this principle — not a condemnation case but the Hudson Tubes reorganization proceeding).
It may seem odd that both parties should charge each other with not having presented at the trial expert evidence of value. If this were so, it indeed would be a strange record, especially since this has been an exhaustively prepared and extensively ■ submitted condemnation proceeding, path’s attorneys assert that claimants have merely introduced ‘ ‘ arithmetical exercises ’ ’ by experts on reproduction cost and original cost. Claimants’ attorneys state that path’s experts merely gave their personal theories of the legal principle to apply, stating solely their ‘ ‘ argumentative legal conclusions ” to be drawn from the railroad’s financial condition.
However, the court finds that claimants have offered relevant proof for it to take into consideration — evidence both as to original cost and reproduction cost — neither impeached nor contradicted. They ask the court to fix a just and equitable award on all the evidence, including a consideration of unprofitability. path, on the other hand, chooses to submit a figure based on conclusions of its experts, hopeful the court will agree with it. Perhaps this is the best the parties could do in seeking to sustain their opposing contentions in view of the unusual situation.
*528 Such the court perceives it to be. The public authority has condemned to take the railroad while still operating in order to continue it in the same use. It was functioning normally and safely on September 1, 1962, as it had for many years before. It had not been a money-maker and probably would not and could not be while in private ownership, path’s experts opine that that reduces its highest and best use to liquidation value. “ Value is a word of many meanings ” (Southwestern Bell Tel. Co. v. Public Serv. Comm., 262 U. S. 276, 310 [1923, Mr. Justice Brandéis] ). The word gathers its meaning in a particular situation from the purpose for which the valuation is being made. (See Bonbright, Valuation of Property [1st ed., 1937], pp. 4 — 6.)
Burpee persisted in his statement that the railway had no “ commercial value ” because it was unable to operate profitably but he readily conceded it had utility. Too, he admitted that he would not recommend it be dismantled and discontinued. The realism of the latter observation, in the court’s view, negates the validity of any opinion expressing liquidation and scrap value. Scrap value, which Wyler testified, would be obtained by dismemberment of the railroad and the separate sale of its components. It strikes the court as unfair and patently contradictory to assign scrap value in one breath and in the next to say the property should not be junked.
Not to be overlooked is the fact that Burpee, at one time, in writing on this subject specified three factors which should “ be considered in determining the value of public utility property ’ ’, i.e., earnings, reproduction costs and actual cost. In this case, he failed to consider the latter two. The court, however, will consider all three.

Reproduction Cost May be Considered.

The court agrees with path that reproduction cost is not the formula to use in this case in ascertaining value. The cases where it was used as the sole criterion are inapposite. Necessarily, it must appear that there would be a reasonable likelihood of reproducing the same railroad. For a business or public utility, the profitability of the undertaking would be of prime importance. Such is the realistic view taken by the courts. (See United States v. Benning Housing Corp., 276 F. 2d 248, 250.)
Recognizing the factors already alluded to rendering this commuting railway, as well as others throughout the country, incapable of operating profitably, claimants have not urged l hat reproduction cost is the sole standard to apply. However, they offered such proof and it was received as likewise was *529 proof under different theories proffered by petitioners. (Matter of Board of Water Supply of City of N. Y., 277 N. Y. 452, 458.) In the exceptional circumstances of this condemnation ease, as conventional formulas are inappropriate, they must yield. (Banner Milling Co. v. State of New York, 240 N. Y. 533, 546.) Therefore, all available approaches and information helpful and relevant in ascertaining just compensation, should be received for consideration by the court.
path’s attorneys cite and quote from Market St. Ry. Co. v. Commission (324 U. S. 548 [1945]), as authority rejecting a consideration of reproduction cost. That case was concerned with the propriety of the fare rate fixed for the San Francisco Transit line by the commission. It was claimed that the rate, failing to take into consideration reproduction cost, constituted an unlawful taking. But “No study of the present cost of reproduction is shown * * ® Nor do we think it important ” (p. 564). Here a study of reproduction cost is shown. Moreover, in that ease a rate of 6 cents was fixed on the price at which the company offered to sell the property to the city and at which it actually did sell to the city after negotiations and before the question was presented to the Supreme Court, for which the issue was preserved.
Although the decision is not applicable to a condemnation proceeding, it does present an observation significantly appropriate to consider hero, which is “no responsible person would think of reproducing the present plant, consisting in substantial part of cable cars and obsolete equipment ” (p. 564).
The Hudson Tubes on September 1, 1962, had a large number of cars in very poor condition, requiring replacement, and some components of the system that were obsolete. No one testified, or even suggested, that the system would be reproduced along the same lines and with the same kind of equipment, if not taken. Much of it, of course, was usable and has been continued in use- — and this is especially true with respect to the tunnels. Claimants, recognizing these facts, do not ask for a valuation based on reproduction, although they submit such an analysis for consideration. For that limited purpose, the court accepts it.
The Hudson Tubes system has a similarity to the New York City Fifth Ave. Bus case (discussed infra) and the San Francisco Gable Gar case in that all three are transit systems and companies unable to operate profitably. Beyond these features, there is a marked difference. The Fifth Avenue Coach Company operated buses over public streets and the San Francisco Transit Company operated obsolete cable cars over *530 public streets. The components of the Hudson Tubes principally are four subaqueous trans-Hudson tunnels, subway stations, and other facilities, much different from the former two transit systems. Its tunnels are rather unique. The nature of these component properties as a functioning transit system, already fully described, distinguishes this case — apart from other factors. Reproduction in condemnation valuation was appropriate for the buses, and although reproduction is often a factor in rate cases, the obsolete cable cars and the special facts of the case permitted the court to hold it was not error to exclude it in rate fixing in that case.
There is no precedent admeasuring the weight which reproduction cost less depreciation and obsolescence should have in a situation as here presented. The concept of utility, unlike the concepts of cost and reproduction cost, is extremely difficult if not impossible to reduce to a quantitative expression. Because of its nature it does not lend itself to mathematical computation. But the court is duty bound nonetheless to render its decision quantitatively in dollars. Therefore, of necessity it is obliged to receive and consider any evidence which will help in attaining a just result. (See United States v. Benning Housing Corp., 276 F. 2d 248 [C. A. 5th]; Brooks-Scanlon Corp. v. United States, 265 U. S. 106, 125; Onondaga County Water Auth. v. New York Water Serv. Comm., 285 App. Div. 655, 661-663.)
In this case, reproduction cost has a legitimate place. It is a part of the entire picture. No one has testified that the major components of this integrated functioning transit system are so obsolete that they must be discarded. Reproduction would not be undertaken because of unprofitability. But continued use is not foresworn. Fairness therefore dictates that reproduction cost be considered as a factor in overruling any theoretical negation of value. And where it is not used as the sole standard, as here, this proof is of further service. It serves to hold in check and to act as a balance to an approach to valuation that would be inequitable in view of the exceptional facts of the case.

Liquidation or Scrap Value is Unwarranted and Impermissible. This Functioning Railroad Must Be Valued As Property in Use.

The Fifth, Ave. Bus case is the subject of much contested discussion by the parties in their trial briefs (Matter of City of New York [5th Ave. Coach Lines], 23 A D 2d 463 [1st Dept., 1965], affg. 46 Misc 2d 14 [Sup. Ct., 1964]). It is an important decision to consider. The Trial Judge, Mr. Justice William C. Hecht, an experienced and highly respected jurist, charted *531 a new pathway in condemnation valuation of a functioning but nonprofitable public utility. He declared (p. 26) the property “must be valued as property in use”, and the Appellate Division, in affirming, agreed, stating (p. 466) the bus company’s “properties were integrated, and so functioning, they should not be appraised as though unintegrated and dismembered ’ ’, adding “ They are worth something more, although to be sure, not entitled to the same increment of value they would enjoy were they operating profitably or with the capacity for future profitable operation ’ ’.
These observations of the Appellate Division aptly apply to this railroad. In that case, the Trial Judge applied reproduction cost less depreciation (46 Misc 2d 14, 33).
The facts of this case require a different approach in ascertaining just compensation. It is not an increment over liquidation value, as path’s attorneys suggest and interpret the Appellate Division’s opinion in the Fifth Ave. case to hold. Nor should it be reproduction cost of the component parts, taking into consideration physical and functional depreciation, as well as “ going concern” and “ nonprofitability ” factors.
Nor would a security valuation have any validity in “ confirming ” an opinion expressing liquidation value, when it is attempted to apply it in ascertaining just compensation in a condemnation proceeding (see Matter of United States Comm., 295 F. 950, 954; 1 Bonbright, Valuation of Property [1st ed., 1937], pp. 244-249, 444-446; 2 Orgel, Valuation under Eminent Domain [2d ed., 1953], § 220, p. 161).[4]
*532 This is not a case where path steps into possession of a railway with an ability to earn and in fact earning. If that were so, “ It should pay therefor not merely the value of a system which might be made to earn, but that of a system which does earn.” (National Waterworks Co. v. Kansas City, 62 F. 853, 865.)
Since path has taken the railroad functioning and in operation, it must be valued as one in use. “Nor can it be doubted that the property must be valued as property in use. It involves a practical contradiction in terms to say that properly useful and actually used in public service is not to be estimated as having the value of property in use, but is to be reckoned with on the basis of its ‘ junk value’.” (Denver v. Denver Union Water Co., 246 U. S. 178, 191.)
The intangible plus to be accorded in valuing property ‘ ‘ in use ” should be reflected “ in the appraisal of the physical assets as part of an assembled whole.” (Cardozo, J., Columbus Gas Co. v. Commission, 292 U. S. 398, 411.)
No court decision has been unearthed holding that an operating utility taken in condemnation should have its component parts separately awarded scrap value to which a moderate increment for “ going concern ” value, may be added — a concluding proposal proffered by path’s attorneys in their trial brief.
“ The value in equity and justice must include whatever is contributed by the fact of the connection of the items making a complete and operating plant.” (Omaha v. Omaha Water Co., 218 U. S. 180, 202.)
Not only is there no market for the railway as a whole, no one has suggested an instance of the sale and purchase as separate units of tunnels under and across the Hudson River extending from lower New York to New Jersey. This is mentioned because Burpee testified to giving salvage value to different components, such as obsolete cars and rails to be sold for whatever metal and parts value they might have and for which there exists a scrap market — and for the tunnels, for which there is no market, he attributed practically no use or value, suggesting that all that could be done with them would be to plug them on a dismemberment of the railway.
When one reflects on what was involved in the construction of these four tunnels, realizing that but the minimal expenditure of $82,000 for minor defects is required and that they can be used with safety into the indefinite future, it is easy to see that Burpee’s suggestion is not one that the court can seriously contemplate as a reasonable probability.

*533
Consideration of the Four Trans-Hudson Tunnels.

Oil behalf of claimants, David G. Baillie, Jr., testified as an expert witness as to reproduction cost of the four tunnels and the subways. He is a civil engineer with vast experience in the construction of tunnels and subways, having participated in the construction of the first tube of the Lincoln Tunnel, the Queens-Midtown Tunnel, and the Brooklyn Battery Tunnel, among others. He testified that there were more than 70,000 feet of tunnels, subways and stations, 42,600 feet of which, for the most part, were erected under the Hudson River by driving shields within which the excavation was made under compressed air.
Also Baillie testified that the rate of progress and the wages paid to gangs working in the shields would depend on the materials through which and the pressure under which the tunnels were driven. And since those materials and pressures vary along the length of the tunnels, it was necessary for him to determine these facts for every foot of shield-driven tunnel, from the sinking of the construction shafts on the shore to the meeting of two shields under the river. He stated that he was able to determine the wages that would be paid to the gangs working in the shield at each point of progress.
Baillie based his estimate on the different kinds of tunnel structure actually in place, with the single exception that he substituted the standard 15 feet and 3 inches inside diameter cast-iron line tubes for limited quantities of brick tunnel and 19 feet and 5 inches outer diameter cast-iron line tubes reinforced with a concrete inner lining, both of which would have been more costly to reproduce. He based his estimate of labor costs on the union scale for sandhogs prevailing in New York and New Jersey on September 1, 1962, when the basic rate for a six-hour day was $41.20. But as the pressure under which work is done increases, the basic rate increases and the number of hours a sandhog is permitted to work under State and union safety regulations decreases, thus increasing labor costs.
In estimating the reproduction cost of other tunnel structures, such as cut and cover and open cut, Baillie adopted the unit price per foot of construction, basing his estimate on a careful study of actual bids for comparable work, trended by Engineering News Record indices, to arrive at 1962 price levels.
Also he separately estimated the engineering costs of the project, including all necessary design and supervision, from preliminary survey and soils investigation, through design of the tunnel to supervision of the actual construction, adding *534 profit, contingencies and general overhead, items which would be part of a contractor’s price.
For the four tunnels, he estimated a total reproduction cost of $383,678,198, deducting 10% depreciation of $38,737,856, for a total of $344,940,342. He allowed $40,275,000 for engineering, borings and inspection and overhead, less 10% for depreciation, or total of $36,208,836, which he added to $344,940,342, making a net total of $381,149,178.
This reproduction cost of the tunnels was in no wise assailed. However, path contends the tunnels and the entire railway system would not be reproduced by anyone. But the fact remains that the tunnels are being used intact, and the railway system too, with improvements.
Burpee admitted that the tunnels represent more than 50% of the value of the entire system. Of the reproduction costs, less depreciation, given by claimant’s experts, the tunnels represent more than 75% of the total.
Burpee would charge them with a degree of obsolescence because they are single-track and because of the curves in the Hudson Terminal. Too, he would recommend the expenditure of approximately $82,000 to rectify some defects.
The court finds that the tunnels are sound and safe and have a utility as such into the distant and indefinite future. The uncontroverted evidence in the proceeding sustains this finding. They should be considered as the most vital and important component of an operating trans-Hudson commuter rail system.
The tremendous ratio of value of the tunnels to the entire Hudson Tubes system inclusive of all its other components, their fundamental significance and necessity for a trans-Hudson system and their continued use for the same purpose by the taker, the relative permanency of their construction, are important factors, outweighing all others in the court’s mind in reaching an evaluation for just compensation.
Therefore, upon consideration of these findings and of the proof of reproduction cost reflecting strength and enrichment to the proof of original cost of the tunnels and subways, the court attributes to them the sum of $30,000,000 in its final analysis.
COHCLUSIOH (RAILROAD)
In this condemnation proceeding, the most often used market value approach to valuation cannot be considered, because of the total absence of a market for the railroad. Liquidation or salvage value because it is incapable of producing a profit is *535 unwarranted and impermissible, for it is an integrated, functioning system. Nor is confirmation of such liquidation valuation by a security analysis relevant proof. Reproduction cost is admissible for consideration. But it may not be used as the criterion for just compensation, because of the nonprofitability of the railroad as a business enterprise. The court turns to original cost, which is buttressed by reproduction cost.[5] But the court must observe that nonprofitability serves as a potent check to the application of the latter in any significant measure. In addition, the court must give due consideration to the significant fact that this is an integrated, operating system, whose component parts as an assembled whole should include an indefinable plus of property 11 in use
If analogy is found in Newton’s experiment with prisms showing that white light is composed of all the colors of the spectrum, each lending its own characteristics to a degree when passed through a prism, all the approaches to valuation entering into the informed mind and sensitive conscience of the court lend to an appropriate degree in the resulting decision.
Thus, in arriving at its ultimate valuation as just compensation of the railroad, the court makes an aggregate awrard of $800,000 for Damage Parcels No. 5 to No. 52 inclusive, located in New York State and the State of New Jersey (included as rights of way, land, improvements and easements in the original cost exhibit); and as already stated, the court makes an allocation of valuation of $30,000,000 for the tunnels and subways. To these figures, mindful of the proof that the tunnels and subways represent more than 50% of the worth of the entire railroad, the court adds for the remainder an amount it considers fair, equitable and just, treating the railroad as an entire integrated and operating system, to make the sum of $55,000,000 as the total award for the entire railroad.
The court expresses its appreciation to eminent counsel on both sides and their capable assistants, always deporting themselves as gentlemen and as paragons of the legal profession, for their thorough preparation and masterful presentation of the extensive evidence in this exceptional and arduous trial.
As what might be termed an epilogue, it may be appropriate to note a reflection made by the illustrious Mr. Justice Felix Frankfurter in one of his lectures, when he stated: “ The core of the difficulty is that there is hardly a question of any real *536 difficulty before the court that does not entail more than one so-called principle * * *. This contest between conflicting principles is not limited to law * * *. But judges cannot leave such contradiction between conflicting ‘ truths ’ as ‘ part of the mystery of things. ’ They have to adjudicate. If the conflict cannot be resolved, the task of the court is to arrive at an accommodation of the contending claims. This is 'the core of the difficulties and misunderstandings about the judicial process. This, for any conscientious judge, is the agony of his duty. ’ ’
The Port Authority Trans-IIudson Corporation is directed to prepare and submit a partial separate tentative decree accordingly.

. See New York Times — Real Estate Section, November 21, 1965 “Many of City’s New Buildings Are Just Old Ones Redressed.”

. O’Keefe explained this 1958 figure of value. He testified that when he gave a value for these properties of $16,000,000 to the trustee in May, 1958 he did not base it on any specific rehabilitation, only on the basis that a buyer would spend about $3,300,000 in some undefined rehabilitation. That that figure was based on actual income not on projected income after rehabilitation. Moreover, he states $6,142,771 had been put on the buildings prior to 1962.

. Not considered as evidentiary in this proceeding. But illustrative of the effect of scarcity of land on prices in Mid-Manhattan — which would be the same, in lower Manhattan, see Wall Street Journal — October 22, 1965, “ Joint Venture By Land under New York Building ”, and New York Herald Tribune, November 19, 1965, p. 23 — “ Another Park Ave. Skyscraper

. There arc cases where the market value of securities as established by-market transaction, are regarded as important, such as appraisal of shares of dissenting minority stockholders at the time of a change in a corporation’s affairs, as when voting rights are limited or abolished. Even then, there must-be a free and open market and the volume of transactions make the market a fair reflection of the judgment of the buying and selling public. (See Matter of Marcus [Macy & Co.], 273 App. Div. 725, 727 [1st Dept., 1948].)
Here, there was insufficient volume of sales to draw any conclusions from, or give consideration to, the transactions or bid and asked quotations in the absence of transactions. In short, the securities valuations made by Wyer and Burpee were devoid of the factual ascertainment and showing of market volume which is necessary to make a meaningful market study.
Also, to be meaningful in a condemnation proceeding, there must be presented proof of total value of complete ownership of the company whose property is being condemned. Transactions involving small sales or even small minority interests “ do not carry control, and hence their quoted prices are usually determined without reference to the power and perquisites that would be enjoyed by a sole owner of the business” (1 Bonbright, Valuation of Property [1st ed., 1937], p. 247).

. Stephenson Brick Co. v. United States (110 F. 2d 360 [C. A., 5th]); Borough of Hanover v. Hanover Sewer Co. (251 Pa. 95); Matter of Board of Water Supply of New York (277 N. Y. 452, 458, 459); New Rochelle Water Co. v. State of New York (9 A D 2d 824 [3d Dept., 1959]).